Felix FERINA, Appellant,

v.

UNITED STATES of America,
Appellee.

Anthony J. BIASE, Appellant,

v.

UNITED STATES of America,
Appellee.

Anthony CARDARELLA, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 16783, 16908, 16784, 16909,
16786, 16911.

United States Court of Appeals
Eighth Circuit.

April 17, 1962.

Rehearing Denied May 14, 1962.

96

Kenneth C. West, Kansas City, Mo., for appellant, Felix Ferina, and Walter A. Raymond, Kansas City, Mo., on the brief with him in case No. 16783.

Moss H. Silverforb, Kansas City, Mo., for appellant Anthony Biase in case No. 16784.

Kenneth C. West and James Patrick Quinn, Kansas City, Mo., for appellant Anthony Cardarella and James J. Waters, Kansas City, Mo., with Mr. Quinn on the brief in case No. 16786.

Kenneth C. West, Kansas City, Mo., for appellants Felix Ferina and Anthony John Cardarella in cases Nos. 16908 and 16911 and Walter A. Raymond, Kansas City, Mo., on the brief for appellant Felix Ferina in case No. 16908.

No brief was filed for Mr. Anthony John Cardarella in case No. 16911.

Moss H. Silverforb, Kansas City, Mo., for Anthony J. Biase in case No. 16909.

Allen J. Krouse, Dept. of Justice, Washington, D. C., for appellee in these cases and Herbert J. Miller, Jr., Asst. Atty. Gen., Dept. of Justice, Washington, D. C., and James J. Featherstone, Dept. of Justice, Washington, D. C., on the briefs in the above cases.

Before VOGEL and VAN OOSTERHOUT, Circuit Judges, and GRAVEN, Senior District Judge.

GRAVEN, Senior District Judge.

The appellants were tried in one joint jury trial. On May 22d, 1961, they filed notices of appeal from the convictions and sentences resulting therefrom. On October 26th, 1961, while those appeals were pending, they each filed in the trial court a motion for a new trial on the ground of newly discovered evidence under Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. On November 15th, 1961, the trial court entered an order denying the motions. On November 16th, 1961, the defendants filed notices of appeal from that order. The original appeals were argued in this Court on December 5th, 1961. Decision in those appeals was withheld pending the hearing on the appeals from the order denying their motions for a new trial. This opinion covers both the original appeals and the appeals from the order denying the motions for a new trial.

The issues in the original appeals will first be considered. Some of the events which preceded the return of the indictment under which they were tried will first be noted. Early in September, 1959, Kenneth Bruce Sheetz, a resident of Kansas City, Missouri, was arrested by federal agents for the illegal sale of narcotics in that city. At the trial herein he testified that he had made such sales and previous sales. He further testified that he had purchased the narcotics sold by him from the defendant, Anthony J. Biase, a resident of Omaha, Nebraska. Following his arrest, Sheetz agreed to cooperate with the federal authorities

in bringing to justice others engaged in the illegal distribution of narcotics. Bernard A. Theisen, Jr., a federal narcotics agent, was assigned to accompany Sheetz in uncovering those engaged in the narcotics traffic. In connection with that work, Theisen assumed the name of Joe Benedetto. Sheetz and Theisen went numerous places, including Omaha, Nebraska. Sheetz received a per diem allowance for his expenses from the federal authorities but received no compensation from them for his services. At Omaha Sheetz made contacts with the defendant Biase, and as a result of those contacts Biase made four sales of narcotics to Sheetz and Theisen. The purchases made by Sheetz and Theisen from Biase were the only purchases of narcotics made by them during their travels. The defendant, Anthony J. Biase, was generally known and referred to as Tony Biase.

During a session of a federal grand jury for the District of Nebraska in March, 1960, Sheetz appeared before it and testified as to the illegal sale of narcotics by Biase. On March 22d, 1960, that grand jury returned an indictment against Biase based on the sales of narcotics made by him to Sheetz and Theisen. Biase was released on bail awaiting his trial under that indictment. On the forenoon of June 20th, 1960, two men identified by Sheetz as the defendants Ferina and Cardarella lay in wait inside the door of Sheetz' residence in Kansas City, Missouri. Upon Sheetz' return home and following his opening the door he was shot several times. Sheetz testified that during the shooting one of the two men said to him, "Here's something from Tony."

On July 14th, 1960, a grand jury for the Western District of Missouri returned the indictment in the present case. In Count I of the indictment the defendants Cardarella and Ferina were charged with injuring Sheetz because of his having testified as a witness before the Nebraska federal grand jury. In Count II the defendants Cardarella and Ferina were charged with endeavoring

to intimidate Sheetz from being a witness in the trial of Biase to be had in Nebraska. In Count III Carlton A. Young was charged with endeavoring to intimidate and influence Sheetz from being a witness in the same trial. In Count IV Biase, Cardarella, Ferina and Young were charged with conspiring to injure Sheetz for his having testified as a witness before the Nebraska federal grand jury and to intimidate him from being a witness at the impending trial of Biase.

Counts I, II, and III were based on Section 1503, Title 18 United States Code. That Section provides, in part, as follows:

"Whoever corruptly, or by threats or force, or by any threatening * * * communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States * * * or injures any party or witness in his person * * * on account of his * * * having attended such court * * * or on account of his testifying or having testified to any matter pending therein * * * or corruptly or by threats or force, or by any threatening * * * communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

Count IV is based upon the conspiracy statute, Section 371, Title 18 United States Code.

Following the indictments just referred to, Biase, in September, 1960, was tried and found guilty in Nebraska under the Nebraska indictment. Sheetz was subpoenaed as a witness at that trial but did not testify. Following his conviction Biase was sentenced to be imprisoned for fifteen years. He is presently serving that sentence.

At the trial of the present case, at the end of the Government's case in chief, each of the defendants made a motion for judgment of acquittal. The motion of the defendant, Carlton A. Young, was sustained. The motions of the other defendants were overruled. None of the defendants testified. The defendant Cardarella presented several witnesses. At the end of all the evidence each of the remaining defendants made a motion for judgment of acquittal. Those motions were overruled. The jury found the defendants Ferina and Cardarella guilty on Counts I, II, and IV and the defendant Biase guilty on Count IV. The trial court imposed five-year prison sentences upon the defendants Ferina and Cardarella under Counts I and II, the terms to run concurrently. The trial court imposed five-year prison sentences upon the defendants Ferina, Cardarella and Biase on Count IV. The prison sentences imposed upon the defendants Ferina and Cardarella on Count IV run consecutively to the sentences imposed upon them on Counts I and II.

The appellants, hereafter referred to as the defendants, make a number of contentions. Each of them contends that the evidence was insufficient to sustain their convictions. In that connection the defendants Ferina and Cardarella urge that the testimony of Sheetz identifying them as his assailants was lacking in credibility. The defendant Biase urges that evidence connecting him with Sheetz' assailants is lacking. All of the defendants contend that the chief trial attorney for the Government in his argument made improper statements in connection with the matter of the credibility of Sheetz as a witness. Each of the defendants contends that the trial court erred in failing to strike the testimony of certain witnesses. The defendant Biase contends that the trial court erred in not sustaining his objection to the testimony of Sheetz as to the statement, "Here's something from Tony."

Sheetz prior to 1956 had been convicted of burglaries in Virginia and had served prison terms under those convictions. In 1956, following the completion of those terms, he came to Kansas City, Missouri. In 1960 he and his wife were residing in a house in the residential portion of Kansas City. His

wife operated a beauty shop and was away from home during the day. His means of livelihood in Kansas City was the subject of extensive inquiry at the trial. He testified that he worked for a concern that put in air conditioners, furnaces and plumbing. The defendants claimed that he was engaged in illegal activities. The only direct proof of illegal activities on his part during the period he resided in Kansas City was the proof relating to his sale of narcotics. It is manifest that Sheetz turned informer in the hope that by so doing he would be treated with leniency on the narcotics charge against him. No promises of leniency were made to him. Sheetz subsequently plead guilty to the narcotics charge but at the time of the trial in the present case had not been sentenced.

The events connected with the shooting as detailed by Sheetz will be next noted. On the forenoon of June 20th, 1960, at around 10:30 A.M., he went to his residence in Kansas City. His wife was at her beauty shop. It was a bright sunny day. The shades in the house were drawn. Upon arriving at his residence he unlocked and opened the door. He then noticed a movement behind the door. He looked in the direction of the movement and saw the defendants Ferina and Cardarella. Cardarella was standing in front of the two with a gun in his hand. Ferina had a dark colored handkerchief over the lower part of his face. Sheetz was first shot in the stomach. He then attempted to pull the door towards him, but it was pulled back. Sheetz then turned and started away. As he got a step away from the door he was shot in the back. The impact of the shot caused him to turn around and he then saw Ferina and Cardarella standing in the doorway. Sheetz was then shot through the head. As he fell down on the porch one of the two men said, "Here's something from Tony." It was Sheetz' recollection that Cardarella held the gun in his right hand and was not wearing glasses.

One of the matters the defendants strongly urged to the trial judge and vigorously argued to the jury was that Sheetz falsely identified Ferina and Cardarella as his assailants. The defendants make the same contention here. The evidence as to the background and activities of Ferina and Cardarella is somewhat meager. Cardarella's wife testified as a witness in his behalf. She testified that he had been unemployed during the last five years. It appears that Ferina and Cardarella engaged in golf. It appears that both are of Italian descent and that both belonged to an Italian social club in Kansas City. It also appears that Cardarella was known and referred to as Tiger Cardarella.

Cardarella presented witnesses who testified that he was left-handed and was so nearsighted that he wore glasses. He also presented witnesses who testified that he was at another place in Kansas City at the time of the assault.

The Sheetz residence was located at 4501 Michigan Street in Kansas City. It is located near the intersection of 45th Street and Michigan Street. Immediately following the shooting a motorist, Mrs. Anna DeWitt, an employee of the Kansas City School District, was driving east on 45th Street. She saw two men run out from a trellis at the rear of the Sheetz residence. One of them was wearing a white mask. The two men ran into the street and then ran east on 45th Street. She testified that she thought the man without a mask was a colored man. Mrs. DeWitt drove to a nearby grocery store and called the police. She drove back to the scene of the occurrence and waited until a police officer, one Robert W. Sanders, arrived. She then imparted her information to him. Included in that information was the information that the man without a mask appeared to be a colored man. Later she was shown a number of photographs, most of which were those of colored men. She was unable to identify any of the men whose photographs were shown her as being the man she saw. Mrs. DeWitt testified that the men she saw were not Ferina and Cardarella. Shortly following the shooting John Nelson, Jr., a city mail

carrier, was delivering mail in the vicinity of 4500 Garfield Street, which was about two blocks east of the Sheetz residence. He saw two men proceeding in a hurried manner east on 45th Street. He testified that both men were white men and that one of them was of dark complexion whom he thought was an Italian. He was unable to identify Ferina and Cardarella as the two men he saw. Donald Erwin, a truck driver, testified that at about the time in question he was driving a truck west on 45th Street. He testified that he saw two men running east on 45th Street; that he had just a passing glance at the two men; that neither of the men was colored; and that Ferina and Cardarella were not the men he saw.

Police officer Robert W. Sanders arrived at the scene while Sheetz was writhing in pain on the front porch. Sanders did not think Sheetz would live to get to the hospital. Heavy thick blood was coming out of Sheetz' mouth. He responded to questions by Sanders with difficulty. Sanders testified that Sheetz refused to tell him his name. He further testified that Sheetz said he knew who his assailants were but refused to tell who they were. The premises were examined by police officers. It was found that the rear door to the house had been forcibly entered. A metal prybar was lying on the walk leading to the rear door. A .38 caliber Smith & Wesson revolver was on the ground at the rear of the house. It contained six discharged cartridges. A blue glove was found in a bush near the house. About thirty minutes after the shooting Milton L. Roscoe, Jr., a boy seventeen years of age, found a knotted handkerchief about a block away from the Sheetz house. Later that afternoon, about a block and a half from the Sheetz house, he found a blue knit glove, a blue golf cap and a leather glove. A hair was found in the cap. An expert witness called by the Government testified that the hair was from the head of a person of Caucasian origin and not from the head of a Negro. Patrick J. Allegri, the manager of the Slayton Meadows

Golf Course, testified that Ferina and Cardarella frequently played golf on that course. He further testified that in March, 1960, he sold Ferina a white golf cap of the same type as the blue golf cap found by the witness Milton L. Roscoe, Jr. He further testified that in March, 1961, which was about a month before the trial in the present case, he met Ferina at a prize fight in Kansas City. Ferina said to him "You lying son-of-a-bitch, you never sold me that cap."

Police officer Harry B. Hicks of the Kansas City Police Department Laboratory found some latent fingerprints in and around the rear door of the Sheetz house, but there was no evidence that the fingerprints were those of Ferina and Cardarella. Police officer Hicks took photographs of the scene of the occurrence. While taking pictures a white handkerchief was placed on his camera case. None of the articles found at or near the scene of the occurrence were of significance in the identification of Ferina and Cardarella. The belligerent statement made by Ferina to the witness Patrick J. Allegri as to the matter of the sale of a golf cap to him indicated that Ferina felt concerned about that matter.

Detective Sergeant Robert J. Kelly, Jr., of the Kansas City Police Department went directly from the scene of the shooting to the surgical ward in the hospital to which Sheetz had been taken and interviewed him briefly there. Kelly testified that Sheetz told him that he knew who shot him but he was not ready to tell. Sheetz testified that at the scene of the shooting he felt unable to carry on a conversation and that he was even weaker when he was interviewed in the surgical ward later on the same day. He was operated on that night. The next forenoon Sheetz stated to the police officers that Ferina and Cardarella were his assailants and identified photographs of them.

Sheetz testified at the trial that he was acquainted with both Ferina and Cardarella prior to the time he was assaulted. He testified that he had seen them playing golf together and in a crap game

together; that Ferina ordinarily addressed Sheetz by his first name; that he knew Cardarella as Tiger; that he had not participated in any activities with either of them; and that he knew of no reason for any ill will between either of them and himself.

A search made of the automobile driven by Sheetz just prior to the shooting disclosed a loaded revolver under a newspaper in the front seat and some tools in the back of the car. It was the claim of Sheetz that he felt he was a marked man and had the revolver in his car for his personal protection. The defendants claimed the tools found in the back of the car were burglary tools but the evidence as to that matter was inconclusive.

The claimed lack of credibility of Sheetz as a witness was continually urged by the defendants throughout the trial and was most vigorously urged by them in the jury arguments. The matter of the credibility of Sheetz as a witness was fully covered by the trial court in its instructions to the jury. In those instructions it was made clear that unless they found Sheetz to be a credible witness and believed his testimony the defendants could not be found guilty. The verdicts of the jury made it clear that its members did find that Sheetz was a credible witness and that they did believe his testimony. There are a multitude of decisions by federal appellate courts affirming convictions based on the testimony of informers with criminal records. Among such cases is the case of United States v. Aviles (2d Cir.1960), 274 F.2d 179. In that case the defendants had been found guilty of conspiracy to violate the narcotics laws. One Cantellops was a key witness for the Government. He had a long criminal record, including perjury before a grand jury. On appeal the appellants laid great stress upon the character of Cantellops. The Court in its opinion stated (p. 190):

"They argue that his testimony should have been stricken, that no defendant may be convicted on Cantellops' uncorroborated testimony, and that the indictment should have been dismissed. We do not agree. It was for the jury to judge the witness Cantellops on the basis of all that was brought out about his character, his previous activities * * *."

The Court further stated on the same page:

"It is for the jury to say whether his testimony at trial is truthful, in whole or in part, in the light of the witness' demeanor, his explanations and all the evidence in the case."

The defendants Ferina and Cardarella in the present case vigorously attack the testimony of Sheetz relating to his identification of them as his assailants. They stress the testimony of the witnesses Mrs. Anna DeWitt, John Nelson, Jr., and Donald Erwin who saw the two men running away from the scene of the assault. It is well known that the identification of strangers based upon fleeting glances during exciting moments by even well-intentioned witnesses is fraught with the likelihood of mistake. In the present case the witness Mrs. Anna DeWitt was of the belief that the man she saw without a mask was a colored man. The testimony of the witnesses John Nelson, Jr., and Donald Erwin indicates that Mrs. DeWitt's belief was a mistaken one. According to Sheetz, his two assailants were not strangers to him but were acquaintances of his and that he saw them at close range. The recognition of acquaintances has some features which are not present in the identification of strangers. Where a person encounters an acquaintance there is brought into the situation past subconscious images and past conscious images. Where a person encounters a stranger such person has only the present conscious image of the person observed. The defendants do not suggest any logical reason, motive or purpose on the part of Sheetz to falsely identify Ferina and Cardarella as his assailants out of all of his acquaintances. His acquaintance-ship with them and his relationship with them had been of a friendly nature and

there was no ill will on his part towards either of them. The claim that Sheetz was guilty of false identification or was mistaken in his identification of Ferina and Cardarella as his assailants was continually urged by them during the trial and was most vigorously urged by them in the jury arguments. The question as to the identification of Ferina and Cardarella was, under the record in this case, one for the determination of the jury. The jury determined that Sheetz truly and correctly identified Ferina and Cardarella as his assailants. Although Cardarella presented witnesses who testified that he was at another place in Kansas City at the time of the assault, the jury, by its verdict, determined that such was not the situation. Such a determination was within its province.

■ ■ The assault made upon Sheetz by Ferina and Cardarella, standing by itself, would not constitute a federal offense under Section 1503, Title 18 United States Code. In order for the assault to have constituted an offense under that Section, it must have been made with knowledge on the part of the assailants of Sheetz' past conduct or expected conduct in connection with the federal narcotics charge then pending against Biase and either for the purpose of punishing him for his past conduct in relation thereto or intimidating him in connection with his expected conduct in relation thereto. The trial court made very clear to the jury in its instructions that the burden was upon the Government to establish those matters beyond a reasonable doubt and that unless the Government did so establish those matters Ferina and Cardarella should be acquitted. The jury, by its verdicts, found that the Government had so established those matters. The question then is whether the evidence was sufficient to sustain findings of the jury as to those matters. It is well settled that a jury in making its determinations, in addition to considering the facts which it finds are established by the evidence, may also take into consideration any proper inferences from those facts. It appears

without dispute that Sheetz had turned informer and had brought about the indictment of Biase and that it was expected that he would be a witness in the trial of Biase under that indictment. There was sufficient evidence to sustain the finding of the jury that Ferina and Cardarella made the assault upon Sheetz and that in connection with the assault one of them made the statement, "Here's something from Tony." Biase objected to the testimony of Sheetz as to that statement, which objection was overruled. Ferina and Cardarella made no objection to the testimony as to the statement but disputed its probative effect. Ferina and Cardarella argue that Cardarella's first name was Anthony and that people with that first name are frequently called Tony. Sheetz testified that he did not know Cardarella as Tony but as Tiger. He further testified that nothing had ever occurred in his relationship with Cardarella which would give rise to any ill will towards him on the part of the latter. Sheetz further testified that he had never been involved in any matter with anyone by the name of Tony except Tony Biase. The substance of Sheetz' testimony in that regard was that the only Tony whose name would mean anything to him was Tony Biase.

The words, "Here's something from Tony," constituted a threatening communication. Neither Ferina nor Cardarella, so far as they were personally concerned, had any reason for making a threatening communication to Sheetz. Therefore, for Ferina to say that the assault was something from him would not add anything to what had already been made obvious by the assault itself. Unless it was in some way made known to Sheetz why the assault was being made, the assault itself would be left in the state of being a meaningless assault without apparent motive or purpose. It would seem unreasonable to suppose that Ferina and Cardarella would lay in wait for Sheetz and then proceed to assault him unless they had some motive and purpose for doing so. Since Ferina and Cardarella were acting together, the jury

could properly infer that they had a common motive and purpose and that the communication made by one of them disclosed their common motive or purpose. Since the words used were not mere gibberish, the jury could properly infer that they were intended to convey some message to Sheetz. The jury could properly infer that the words used were intended to convey to Sheetz the message that he was being assaulted for a particular reason and that particular reason was related to and connected with Sheetz' conduct or expected conduct in relation to a certain Tony. The jury could properly infer that the spokesman for the two assailants knew that all that was necessary to bring home to Sheetz the reason for the assault was to refer to Tony. The jury could also properly find as a fact that the only Tony who would mean anything to Sheetz in that connection was Tony Biase and that both assailants knew that such was the situation. The jury could properly infer under those circumstances the words, "Here's something from Tony," were regarded by the assailants as being just as meaningful to Sheetz as the words, "Here's something from Tony Biase," and that the omission of the last name of the latter was not of determinative significance. The fact that the assailants made known to Sheetz that the assault was being made upon him because of his past conduct or expected conduct in relation to Tony Biase would give proper support to the inference that they had knowledge of such past conduct or expected conduct. The only relevant past conduct of Sheetz in relation to Tony Biase was his conduct in connection with the Nebraska grand jury indictment, and the only relevant expected conduct of Sheetz in relation to Biase was his expected conduct in connection with the trial of Biase under that indictment. If the spokesman for the two assailants had stated at the time of the assault, "Here's something for you because you testified against Tony Biase before the grand jury and because you expect to testify against him at his trial," it could not be seriously

contended that such evidence would not be sufficient to establish the motive and reason for the assault. In view of the surrounding circumstances, the jury could properly find that the statement in question conveyed what was in substance the same message, and the meaning of the message was known to both the assailants and Sheetz; and that since the assailants knew the meaning of the message they knew of the past conduct or expected conduct of Sheetz in relation to Tony Biase.

The evidence is sufficient to sustain the convictions of Ferina and Cardarella under Counts I and II of the indictment.

■ The defendants were also convicted of the conspiracy charge contained in Count IV of the indictment. That count also included Carlton A. Young and Biase. As heretofore noted, the trial court sustained the motion of Carlton A. Young for a directed verdict both on that count and on Count III of the indictment. The matter of Biase's conviction under Count IV will be later considered. In Count IV the defendants therein named were, in substance, charged with conspiring to commit the acts set forth in Counts I and II. In order to convict the defendants Ferina and Cardarella under Count IV, it was not necessary for the Government to establish that they conspired with Young or Biase, or both. It would be sufficient if the Government established that Ferina and Cardarella conspired between themselves to do the acts set forth in Counts I and II. Since they were acting together in committing the acts charged in the substantive counts, the jury could properly find that they conspired to commit those acts.

■ The evidence relating to Biase, apart from the statement at the time of the shooting, will be next considered. Theisen, the federal narcotics agent who was with Sheetz in Omaha in connection with the purchase of narcotics, testified that in connection with those transactions Biase made statements which indicated that he was familiar with the narcotics traffic situation in Kansas City. Theisen

testified that at Omaha when he was discussing with Biase the matter of securing heroin Biase told him that he would have to talk to Bennie Barone. He testified that he was informed by someone that he could get in touch with Biase through Bennie Barone. Sheetz testified that on occasions when he was in Omaha Bennie Barone was in the company of Biase. Sheetz did not have a telephone at his residence. He received his telephone calls at his wife's beauty shop. The Nebraska indictment was returned against Biase on March 22d, 1960. Mrs. Sheetz testified that shortly thereafter Bennie Barone called her beauty shop seeking to get in touch with her husband. Barone did not get in touch with him. It appeared that following the return of the indictment Mrs. Sheetz had some communications with Carlton A. Young about the matter of Sheetz having testified against Biase before the Nebraska federal grand jury. No connection was established between Carlton A. Young and Biase, Ferina and Cardarella. In summary, apart from the evidence as to the assault and what occurred during the assault, the Government's evidence as to Biase consisted of proof that Sheetz had brought about the former's indictment by a grand jury and it could reasonably be expected that Sheetz would be a witness against him at the trial under the indictment; and, that following the return of the indictment Bennie Barone, one of Biase's acquaintances, attempted to get in touch with Sheetz by long distance telephone. From the evidence relating to Sheetz' connection with the narcotics charge against Biase, it could be inferred that Biase would feel bitter towards him.

The charges against Ferina and Cardarella and their convictions on those charges were based upon their own acts. The fact that Ferina and Cardarella made it known to Sheetz at the time of the assault that it was being made because of his past or expected conduct in relation to Biase would not by itself make Biase criminally chargeable for the assault. Biase was not present at the scene of the assault and so far as the record shows was not even in Kansas City. In this connection it would seem that the use of a hypothetical situation would bring matters into a clearer focus. A is awaiting trial on a criminal charge and it is reasonably to be anticipated that B will be a witness against him. C and D wait for B at his city residence. A is not in the vicinity or even in the city. They state to B, "A has sent us to beat you up so badly that you will be unable to testify against him." They proceed to assault him. It is manifest that on the trial of C and D on the charge of obstructing justice proof of the assault with the accompanying declaration would properly and adequately support their conviction on that charge. It is also manifest that on the trial of A on the same charge, absent other evidence connecting A with C and D, the proof would not be such as to sustain the former's conviction. The fact that C and D had made known to B that they were assaulting him because of his expected conduct in relation to A would give rise to the suspicion that A had arranged for the assault but such suspicion would not furnish an adequate evidentiary base for his conviction. It is also clear that the fact that the evidence would not be sufficient to hold A criminally responsible would not exonerate C and D from their criminal responsibility.

To connect Biase with the occurrence at the Sheetz residence, the Government relies upon the theory of conspiracy and the closely related theory of agency. Biase claims that his alleged connection with that occurrence cannot be sustained upon either theory. In that connection he relies upon two well-known rules of law. One of those rules is stated as follows in the recent case Tripp v. United States (10th Cir.1961), 295 F.2d 418, 422:

"The existence of the conspiracy cannot be established against an alleged conspirator by evidence of the acts or declarations of his alleged coconspirators done or made in his absence. Such declarations are ad-

missible against him only where there is proof aliunde of his connection with the conspiracy."

The other rule relied on by Biase is stated as follows in 2 Jones on Evidence (5th Ed.1958), p. 625:

"The fact of agency cannot be established by the declarations of an agent, no matter how publicly made, * * *"

It is the view of the Court that Biase's reliance upon those rules of law is well placed. It is the holding of the Court that the evidence is insufficient to sustain the conviction of Biase. Biase assigns errors not referred to. In view of the holding of the Court just stated, it is unnecessary to consider them.

Ferina and Cardarella contend that the chief trial attorney for the Government was guilty of prejudicial misconduct in his argument to the jury. The Government summoned and presented as witnesses all who might have information which would be pertinent to the inquiry even though it was obviously known to it that several of such witnesses would give testimony which was favorable to the defendants. Among the witnesses summoned and presented by the Government were Mrs. Anna DeWitt, John Nelson, Jr., and Donald Erwin. As heretofore noted, they gave testimony which was favorable to Ferina and Cardarella in the matter of identification. The jury arguments appear in the record. The attorneys for the defendants made the first jury arguments. The attorney for Ferina in his argument urged the jury to give the highest credibility to the testimony of the three witnesses referred to and to give no credibility to Sheetz as a witness. In urging the jury to give the highest credibility to the testimony of the three witnesses referred to that attorney told the jury repeatedly they were Government witnesses and that by presenting them as witnesses the Government vouched for their credibility. The Government points out that in his argument that attorney did not suggest or intimate that in so far as the Government vouching for its witnesses was concerned the situation of Sheetz was the same as the situation of the three witnesses referred to. It was in this setting that the chief trial attorney for the Government made his closing argument. In that argument, after referring to the attacks made by the attorneys for Ferina and Cardarella upon the credibility of Sheetz as a witness, he stated: "You don't have to disbelieve him. I don't disbelieve him." The attorneys for Ferina and Cardarella made the objection that the attorney for the Government had made a positive statement of his personal opinion as to this belief in the witness Sheetz. In the presence of the jury the trial judge then stated:

"He is drawing his own inferences. Gentlemen, if you are going to get into that, I think you members of the Bar know that the lawyers should never express what they believe. They say what they believe the evidence shows, but what they believe doesn't mean anything. All of you have found out what it means. You don't express what you believe. What you think the evidence shows, that is your function for all of it. We apply it almost every day in the court room. Go ahead."

The attorney for the Government then stated, "I put Sheetz on the stand and I vouch for him." The attorneys for all of the defendants then joined in the following objections: "This man represents the United States Government. His information along that line might conceivably differ from the information that he has, information not before this jury, and we object to that as highly prejudicial * * *."

Statements by a prosecuting attorney in his jury argument as to the credibility of witnesses which could be considered as an attempt on his part to furnish personal evidentiary support for his contentions is improper and in some settings has been held to constitute prejudicial misconduct. In support of their contentions the attorney for the Government was guilty of prejudicial misconduct in his argument to the jury, the defendants cite a number of

cases. They cite and place reliance upon the case of Greenberg v. United States (1st Cir. 1960), 280 F.2d 472. The conduct of the prosecuting attorney in that case is described as follows (p. 474):

"The United States attorney commenced his final argument by informing the jury that he was 'a sort of thirteenth juror [who] applies his training in the evaluation of evidence, in analyzing evidence, and tries to convey to the jury just what part the evidence plays in the presentation of a case' (a description we find quite inappropriate, since counsel, unlike a juror, is not required to be impartial). Near the end of his argument the United States attorney sought to put this self-appointment to use. In vigorous language he expressed his personal opinion of the trustworthiness of the government's evidence and the consequent guilt of the accused. Upon objection interposed, the court ruled in the presence of the jury that the prosecutor had a right to argue 'his belief in the evidence.' Counsel continued, and the court overruled a second objection, but expressed a caution. The argument was then repeated."

The Court held that the conduct of the prosecuting attorney constituted prejudicial misconduct and reversed the conviction. There are numerous cases involving the question as to whether the statements of a prosecuting attorney in argument constituted prejudicial misconduct. They are collected in a recent annotation. 81 A.L.R.2d 1240. In the recent case of Isaacs et al. v. United States (8th Cir.March 22d, 1962), 301 F.2d 706, Judge Matthes discusses the matter of the conduct of prosecuting attorneys in jury arguments.

In the case of Lawn v. United States (1958), 355 U.S. 339, at pages 359–360, 78 S.Ct. 311, at pages 322, 323, 2 L.Ed. 2d 321, in footnote 15, appears the following:

"15 Petitioner Lawn also contends that a statement made by the Government's attorney in his closing summation to the jury, saying, in pertinent part, 'We vouch for [Roth and Lubben] because we think they are telling the truth,' deprived him of a fair trial. No objection was made to the statement at the trial. The Government's attorney did not say nor insinuate that the statement was based on personal knowledge or on anything other than the testimony of those witnesses given before the jury, and therefore it was not improper. * * *"

The Court went on to state that the attorney for the petitioners in his summation had invited the reply.

In the case of United States v. Klein (7th Cir. 1951), 187 F.2d 873, p. 876, certiorari denied (1951), 341 U.S. 952, 71 S.Ct. 1021, 95 L.Ed. 1374, the Court states:

"It is hypercritical to say that because, in discussing testimony and its effect, a district attorney uses the words 'I know, etc.' he is thereby testifying on behalf of the prosecution. * * *"

█ It is not required that a prosecuting attorney in his jury argument continue to repeat in connection with every statement made by him the words, "as shown by the evidence and the proper inferences therefrom," if the jury understands that his argument is based upon the evidence and the inferences properly drawn therefrom. In the present case the attorney for the Government at the outset of his argument informed the jury he would demonstrate to it from the evidence adduced that the Government had a case against the defendants. In overruling the objection of the defendants to the statement in question, the trial judge stated, in substance, that he regarded the statement in question as being based on inferences drawn from the record in the case.

█ The jury argument of the attorney for Ferina left the possible erroneous implication that while the Government vouched for the credibility of the Govern-

ment witnesses whose testimony was favorable to the defendants it was unwilling to vouch for the credibility of Sheetz. It was proper for the attorney for the Government to correct that possible erroneous implication by making it known to the jury that the Government did vouch for the credibility of Sheetz.

Under the circumstances in this case, it would be difficult to infer that the attorney for the United States, by his argument, conveyed to the jury the idea that he had any information bearing on the credibility of Sheetz other than what was brought out at the trial. Sheetz was cross-examined at great length as to his previous life and activities, including his illegal activities. It would seem that in that situation there would not be much, if any, likelihood that the Government had any relevant information beyond the full information presented in court and that it would seem to be far-fetched to assume that the jury could possibly infer that by the statement in question the attorney for the United States meant to convey the idea that he had information bearing favorably on the credibility of Sheetz beyond that developed at the trial.

It is the holding of the Court that the claims of Ferina and Cardarella that the chief trial attorney for the United States was guilty of prejudicial misconduct in his argument to the jury are not well founded.

Ferina and Cardarella claim that the trial court erred in overruling their motions to strike the testimony of certain witnesses which were made at the end of the Government's case in chief. The Court has considered those assignments of error and finds them to be without merit.

The appeals by the defendants from the denial of their motions for a new trial on

the ground of newly discovered evidence will be next considered.[1]

The matters to be considered in connection with a motion for a new trial, based upon newly discovered evidence, are stated in the leading case of Johnson v. United States (8th Cir. 1929), 32 F.2d 127. In that case the Court set forth the requirements for the granting of a new trial upon the ground of newly discovered evidence. It stated (p. 130):

"There must ordinarily be present and concur five verities, to wit: (a) The evidence must be in fact, newly discovered, i. e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal. * * * *"

While the decision in the case of Johnson v. United States, supra, antedated the adoption of the Federal Rules of Criminal Procedure, yet this Court in the case of Connelly v. United States (8 Cir., 1959), 271 F.2d 333, cited the former case and followed it as to the five requirements above set forth.

In the case of United States v. Johnson (1946), 327 U.S. 106, 66 S.Ct. 464, 90 L. Ed. 562, a motion for a new trial on the basis of newly discovered evidence based upon the claimed perjury of a witness was denied by the trial court. The Circuit Court of Appeals reversed. Upon review the United States Supreme Court held that the Circuit Court of Appeals erred in doing so. The Court further stated (p. 112 U.S., 66 S.Ct. at p. 466):

---

1. Those motions were filed while the original appeals were pending in this Court. However, it was permissible for the trial court to entertain and deny the motions without asking for remand from this Court. Rule 33, Federal Rules of Criminal Procedure; Smith v. United States

(109 U.S.App.D.C. 28, 1960), 283 F.2d 607, 610, 611, certiorari denied (1961), 364 U.S. 938, 81 S.Ct. 387, 5 L.Ed.2d 369. If the trial court had determined that the motions should be granted an application to this Court for a remand for that purpose would have been in order.

"The trial judge's findings were supported by evidence. He had conducted the original trial and had watched the case against Johnson and the other respondents unfold from day to day. Consequently the trial judge was exceptionally qualified to pass on the affidavits. * * * "

The Court further stated (p. 112 U.S., 66 S.Ct. at p. 467) that a motion for a new trial on the ground of newly discovered evidence should only be granted where following the trial it clearly appears that, because of facts unknown at the time of trial, substantial justice was not done. The Court further stated (p. 113, 66 S. Ct. at p. 467):

"While a defendant should be afforded the full benefit of this type of rectifying motion, courts should be on the alert to see that the privilege of its use is not abused. * * * "

In the case of Connelly v. United States, supra, this Court stated (271 F.2d p. 334):

"By way of preface, it may be stated that motions for new trial on the ground of newly discovered evidence are looked upon with disfavor and it is equally well settled that such motions are addressed to the judicial discretion of the trial court and its decision will not be reversed on appeal except for a clear abuse of that discretion. * * * "

■ In the present case the trial court, like the trial court in the case of United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, had presided at the original trial and had watched the case unfold from day to day. There was presented to that Court in connection with the motions for new trial the same matters that are presented to this Court. The trial court, after considering those matters, denied the motions. It did not file a memorandum or make findings of fact. Under the applicable standard of review, the trial court's denial of the motions must be sustained unless it clearly appears that such denials constituted an abuse of discretion. Therefore, unless it appears that the showing made by the defendants satisfactorily met all of the requirements for a motion for a new trial on the ground of newly discovered evidence then it was not an abuse of discretion on the part of the trial court to deny their motions and the ruling of the trial court must stand.

There were two grounds for the motions. The first ground is that the police department reports made by police officer Robert W. Sanders contained items as to which he did not testify in the trial in the present case. The second ground of the motions relates to a payment made to Sheetz sometime after the trial in the present case by the Jackson County, Missouri, Prosecutor's Office. The first ground of the motions will be first considered. Because of the holding that the evidence was insufficient to sustain the conviction of the defendant Biase, only the defendants Ferina and Cardarella are concerned with the matter of a new trial. They will be hereinafter referred to as the defendants. In connection with the first ground of the motions, it is necessary to go back to some of the events which preceded the trial in the present case. The shooting occurred on June 20th, 1960. Shortly thereafter criminal proceedings were instituted in the state court of Jackson County, Missouri, in which the defendants were charged with having committed the assault upon Sheetz on June 20th, 1960. Under the Missouri practice a defendant in a criminal proceeding may, in advance of trial, take the depositions of the prospective witnesses. The defendants made use of that procedure and the depositions were taken of police officer Robert W. Sanders, Sheetz, the school employee, Mrs. DeWitt, and others. Subsequently but prior to the trial in the present case two trials were had in the Jackson County state court based upon the assault. It appears that at those trials police officer Sanders, Sheetz, and Mrs. DeWitt testified as witnesses. The first trial was that of Ferina. It resulted in a hung jury. The next trial resulted in his acquittal. Subse-

quently on September 11th, 1961, following the trial in the present case, the charge against Cardarella was dismissed by the Prosecuting Attorney of Jackson County, Missouri. As heretofore noted, the first ground of the motions for a new trial relates to the testimony of police officer Robert W. Sanders. It is the claim of the defendants that in October, 1961, they for the first time learned that in the police department reports made by Sanders on June 20th, 1960, he reported that Sheetz had first stated to him that his assailants were two white men but later said they were two colored men and that he further reported that Sheetz had a white handkerchief in his hand.

Sanders made two police department reports, both dated June 20th, 1960. One report was made on a printed form entitled, "Complaint Report." That report does not contain any reference to any statements made by Sheetz. In it Sanders stated that the two suspects were colored men. Sanders' handwritten report, in part, was as follows:

"Upon arrival I observed the victim, Kenneth Sheetz, W/M, lying on the front porch of 4501 Michigan. The victim was suffering from a bullet wound in the stomach and undetermined injuries about the face. He requested aid and said that he had been shot, but refused to give his name. He also appeared hesitant about giving information about the suspects. He first stated it was two white men and then said it was 2 colored males with white handkerchiefs over their faces.

"Mrs. Durwood DeWitt, W/FC, 4246 S. Benton WA1–9302 who was driving past the house stated that she saw 2 colored males, one of which had a white handkerchief over his face, run from the rear of 4501 Michigan and go East on 45th Street. She could give no further description of the suspects.

\*   \*   \*   \*   \*   \*

"My investigation revealed that the back porch door had been forced open and that part of the back door facing had been removed. The back door had pry marks in the vicinity of the lock and had also been forced open. A 15 inch pry bar was observed outside the house approx. 8 ft. from the rear door. A 38 Cal. Smith & Wesson Revolver serial #223519, containing 6 empty shell cases, was observed on the ground approx. 20 ft. from the back door. Five holes, apparently caused by bullets, were observed in the screen wire and door frame of the screened-in front porch and the holes were made in such a manner as to indicate that the bullets had been fired from within the house.

"Victim removed to General Hospital by City Ambulance.

"The pry bar, revolver, and a white handkerchief, the victim had in his hand, was released to Cruiser 91, Cpl. H. Hicks, who was called to process the scene. \*   \*   \*."

The defendants stress certain portions of the testimony given by Sanders in the taking of his deposition on November 7th, 1960. Those portions are as next set forth:

"Q. What did you find upon your arrival there?

"A. Well, I found the man who was later identified as Kenneth Sheetz laying on the front porch of the residence there at 4501 Michigan. He wasn't laying still; he was thrashing about.

"Q. Did you talk to him?

"A. Yes.

"Q. Did he talk to you?

"A. He mumbled, uttered.

"Q. Could you understand him?

"A. I—yes, and no. Yes, he did say some sentences.

"Q. Did you ask him who shot him?

"A. Yes.

"Q. Did he tell you?

"A. He said he knew, but he wouldn't tell me.

"Q. He wouldn't tell you?

"A. No.

"Q. Did he give you a description of the people that shot him?

"A. Not a description, no.

"Q. What did he say about them?

"A. Actually, he didn't say much about them. His main statements he made was, 'Get me to the doctors' and I pried him for information, and he would answer yes and no to some of my questions.

"Q. Was he in pain?

"A. Severe pain.

"Q. So would you say he knew what he was saying?

"A. Well, it would be hard for me to say. It would take a medical man, I think. I thought the man would die before the ambulance got there.

"Q. But that is the gist of your conversation with him that you have given us up to now?

"A. Yes."

They also stress portions of the testimony given by Sanders in the first state trial. Those portions are as next set forth:

"Q. Now, Officer, I want you to tell the jury whether you talked to him there?

"A. Yes, I did talk to him.

"Q. How long did you talk to him? Over what period of time?

"A. Oh—

"Q. Not continuously, but how long were you there talking to him?

"A. I would say five minutes.

"Q. Did you ask him who shot him?

"A. Yes.

"Q. What did he say?

"A. Well, these were guttural remarks I got, because—

"Q. What did he say that you understood?

"A. I understood that he knew who shot him.

"Q. All right, did he say that?

"A. Yes.

"Q. All right. Who?

"A. Well, he wouldn't—he wouldn't answer that, as to who. He would thrash back again on the other side when I would try to pinpoint him down as to who shot him.

"Q. How many times did you ask him who shot him?

"A. Oh, I would say three or four times.

"Q. What did he say?

"A. He would thrash back over again, he wouldn't answer.

"Q. Well, now what words did he use? You have told us what he said, what words did he use?

"A. Well, he wasn't making—wasn't making any words himself, I was asking him questions and he would grunt, and I know when I asked him his name originally, I asked him who he was—

"Q. Would he tell you?

"A. He wouldn't tell me.

"Q. He wouldn't tell you his own name?

"A. No, sir, he didn't there."

In his deposition taken on November 7th, 1960, Sanders also testified as next follows:

"Q. All right, sir. Aside from these things we have mentioned, did you find anything else out there, or see anything else out there?

"A. Let me think.

"Q. Did you see any handkerchiefs?

"A. Let's see. It seems like a handkerchief entered into it somewhere, but I can't recall where.

"Q. You didn't see any that you remember?

"A. I will tell you, without refreshing my mind *on those reports*, I don't recall. [Emphasis supplied.]

"Q. You didn't find a handkerchief yourself?

"A. No, I don't believe I did."

The matter of the white handkerchief will be first considered. Mr. DeWitt testified that she saw one of the men remove a white mask. Police officer Hicks testified that as he was taking photographs at the scene a white handkerchief was placed on his camera. The testimony of Sanders as to the white handkerchief in his deposition taken on November 7th, 1960, was to the effect that a white handkerchief entered into the occurrence somewhere but that he could not recall how without refreshing his memory from his reports. Sheetz testified in the trial in the present case that the second man standing in the doorway wore a dark colored mask. In his argument to the jury, counsel for Ferina called attention to that testimony. He further stated:

"There is not one piece of evidence in this case that is in any way connected. A handkerchief—somebody found it, at least, it was found in a police officer's camera case. Where did it come from? Heaven only knows. There is a white handkerchief for whatever it is worth."

The pertinent testimony given by Sanders in the trial in the present case will next be noted. After testifying as to being called to the scene of the occurrence, he testified as next set forth:

*(Direct Examination)*

By Mr. Krouse:

"Q. What did you do there when you arrived?

"A. Immediately upon my arrival I observed a group of citizens in the intersection and they pointed to the residence at 4501 Michigan and I could see a body that was thrashing about on the front porch at 4501 Michigan and I went up on the front porch and I found Kenneth Bruce Sheetz laying on the front porch and thrashing about. He had been severely wounded by what appeared to be shots from a pistol. My first impression was that he had been shot in the face with a shotgun because his flesh was all open on his face and he had heavy thick blood coming out of his mouth.

"Q. Did you talk to him?

"A. Yes, sir, I did.

"Q. And what did you ask him?

"A. I asked him if he knew who had done this to him.

"Q. And did he answer?

"A. Yes, sir, he did.

"Q. What did he tell you?

"A. He indicated that he did not. He said, 'Yes.'

"Q. Did he answer yes to all the questions?

"A. No, he didn't. He appeared to be a little hesitant. Of course, in his condition he didn't answer all my questions, but most of the questions I put to him he would either answer 'yes' or 'no'.

"Q. From what you saw of the man there on the porch did he give the appearance to you of being in bad physical shape?

"A. I didn't think he would live to get to the hospital."

*(Cross-Examination)*

By Mr. West:

"Q. Officer, you were the first police officer to arrive at the scene of this shooting, weren't you?

"A. Yes, sir.

"Q. And when you arrived there you saw this man that you thought was about to die?

"A. Yes, sir, I did.

"Q. Now, Officer, you did talk to him, didn't you?

"A. Yes, sir, I did.

"Q. And he did talk to you, didn't he?

"A. Yes, sir.

"Q. Now, believing as you did that he was about to die, did you try to get him to say who shot him?

"A. Yes, sir.

"Q. And he wouldn't tell you, would he?

"A. No, sir.

"Q. Did you ask him what his name was?

"A. Yes, sir.

"Q. Did he tell you that?

"A. No, sir."

While Sanders was called as a witness by the Government, he did not testify to anything that was unfavorable to the defendants. His testimony was, if anything, favorable to the defendants. He testified that Sheetz refused to give his name. He further testified that Sheetz indicated that he knew who his assailants were but refused to tell who they were. As heretofore noted, he was not questioned as to the matter of a white handkerchief. It would seem that the defendants cannot well argue that Sanders gave false answers to the questions put to him during the trial in the present case. One of their claims would seem to be that Sanders might have testified more favorably to the defendants than he did. However, the main thrust of the defendants' argument would seem to be that because of the testimony given by Sanders in his deposition hearing and in the state trials they were led to believe that he had fully recalled all of the details connected with the occurrence so far as he had seen or heard and that, therefore, they did not seek to ascertain what was contained in his police department reports.

■ In order to sustain a motion for a new trial on the ground of newly discovered evidence, a defendant must make it satisfactorily appear that his failure to discover such was not due to lack of diligence on his part. Usually a defendant in a criminal case hears the testimony of the key witnesses for the first time at the trial. Unless he correctly surmises in advance of the trial who the key witnesses are going to be and what they are going to testify to, he has little opportunity in advance of trial to check as to any conflicting or contradictory statements to be made by those witnesses. At the trial he can, following the direct examination of any witness, procure any

statements made to the Government under the so-called Jencks statute. Section 3500, Title 18 United States Code. Following the direct examination of Sheetz, the defendants requested and were given statements given by Sheetz to the Government relating to the subject matter of his testimony. The defendants were also given an opportunity to hear a tape recording made by Sheetz on June 23d, 1960. Neither at the conclusion of the direct examination of Sanders nor at any time during the trial was any request made by the defendants for any similar statements made by Sanders.

■ In the present case, because of the Missouri deposition practice and the two state court trials, there were presented numerous opportunities to the defendants to examine and re-examine all of the witnesses in the trial in the present case long in advance thereof as to all of the details relating to the charge. In July, 1960, the deposition of Sheetz was taken. He was examined and cross-examined as to the details of the occurrence, including what statements he made regarding his assailants. In November, 1960, the deposition of Sanders was taken. He was fully examined and cross-examined as to what was said to him by Sheetz and what he observed at the scene. At both state trials the witnesses, including Sheetz and Sanders, were again examined and cross-examined as to the details of the occurrence. Then at the trial in the present case the same witnesses were again examined and re-examined as to the same matters.

In the deposition of Sanders taken on November 7th, 1960, he made known to the defendants that he had made police reports as to the occurrence and that without having those reports to refresh his memory he had difficulty recalling some of the details of the occurrence. However, apart from that it is well known that police officers called to the scene of a crime or mishap do as a matter of police department routine make reports as to the occurrence. It is well known that police officers have many calls to scenes of crimes or mishaps and

that when called upon to testify as to an occurrence a considerable time after its happening their memories are likely to be blurred as to some of the details. For that reason it is not to be regarded as indicating lack of trust in the credibility of such an officer in a case in which he testifies for an attorney to check the report made by the officer at the time or request him to refresh his recollection from his report. This would seem to be especially so where such attorney had been informed in advance of the trial that the officer had made a report of the occurrence and had manifested some difficulty in recalling some of the details of the occurrence without the aid of such report.

At the time Sanders testified in the two state court trials and at the trial in the present case, the defendants knew from his deposition that he had made reports as to the occurrence. They also knew that from his deposition he had indicated that he experienced some difficulty in recalling some of the details of the occurrence absent those reports. At no time during the three trials did the defendants suggest or request that Sanders bring those reports with him or have them sent for so that they might be used in connection with his examination. There appears to be no reason for assuming that such suggestion would not have been acceded to or such request granted.

The situation would seem to be that it was made known to the defendants on November 7th, 1960, by Sanders that he had made police department reports as to what he had seen and heard at the scene and that he had difficulty in recollecting some of the details without the aid of such reports. There were then two state court trials and one federal court trial involving the same occurrence separated by several months. Then in October, 1961, around six months after the last trial, the defendants for the first time checked into the matter of what was contained in the reports referred to by Sanders eleven months earlier. The defendants do not contend that

they could not have secured access to those reports at any time following the occurrence if they had desired such access. The record plainly shows lack of diligence on the part of the defendants in the matter of discovery of the evidence in question.

In their arguments connected with the matter of diligence, the defendants charge the Government with suppression of the reports in question. The Government denies that charge. In its argument it vigorously asserts that it never had the reports in question and the record supports its assertion. The reports in question were not made to the Federal Government. They were made to the Kansas City Police Department and were a part of its records. There was no way in which the Federal Government could have prevented the defendants from having access to those reports if they so desired. Those reports were as available to the defendants as they were to the Federal Government. The defendants knew of the existence of those reports several months prior to the trial. In a deposition taken of Sanders in another proceeding subsequent to the trial in the present case, Sanders testified as to his contact with Federal officials in connection with the occurrence. He testified that a few days prior to the trial in the present case he was briefly interviewed by one of the Government attorneys in the case. It was Sanders' recollection that he did not have his reports with him. He further testified that during the interview that attorney had some report which he kept referring to and that the report that the Government attorney had seemed to coincide with the facts in the case. At that time the witnesses the Government was going to present in the trial in the present case had already testified in two state court trials and had also testified by way of deposition. It would hardly be likely that the Government would have proceeded to trial in the present case without having a report or reports as to what the witnesses had testified to in the state court trials and in their depositions. Such reports would

naturally include what Sanders had previously testified to. Under the circumstances it would seem more probable that at the time of the interview the report the attorney for the Government was referring to was a report of the previous testimony of Sanders than it was the police department report or reports in question. The defendants' charge that the Government suppressed the reports in question is wholly lacking in evidentiary support.

■ The other ground of the defendants' motions is based upon a $500.00 payment made by the State Prosecutor's Office to Sheetz sometime in May, 1961, after the trial in the present case. The exact date of the payment is in dispute. In another proceeding following the trial in the present case, William A. Collet, Prosecuting Attorney for Jackson County, Missouri, and Sheetz were examined as to the payment. It was the testimony of William A. Collet that the Prosecutor's Office had a contingent fund from which payments were made for witness fees and travel allowances for witnesses in criminal cases. He further testified that Sheetz spent considerable time being a witness in the two state court trials and that the payment was made to Sheetz pursuant to a request therefor by his assistant who handled those trials. William A. Collet further testified that the payment was made to Sheetz solely for all of the time he had spent as a witness in those trials. The defendants argue that because the payment was not made to Sheetz until after he had testified at the trial in the present case the inference is to be drawn that the payment was made to him by the Prosecuting Attorney's Office as a reward for his testimony in that trial. The claimed inference is lacking in evidentiary support. Such being the situation, error cannot be predicated upon the refusal of the trial court to grant a new trial based on the evidence as to the payment in question.

It is the holding of this Court that the trial court did not abuse its discretion in denying the motions of the defendants for a new trial based on newly discovered evidence. In so far as the motions were based on the reports of Sanders, they were properly denied because of lack of diligence. In so far as the motions were based on the post-trial payment made to Sheetz by the Prosecuting Attorney's Office for Jackson County, Missouri, they were properly denied because of lack of evidentiary support for the claimed inference.

The trial court's denial of the motions of the defendants Ferina and Cardarella for a new trial on the ground of newly discovered evidence is affirmed.

The convictions of the defendants Ferina and Cardarella on Counts I, II, and IV of the indictment are affirmed.

The conviction of the defendant Biase on Count IV of the indictment is reversed.

The reversal of Biase's conviction renders moot his appeal from the trial court's denial of his motion for a new trial based on newly discovered evidence, and that appeal is dismissed as moot.